1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                       FOR THE DISTRICT OF OREGON

11  KATHLEEN WOOLSEY-CRANDALL,      )
                                    )
12                  Plaintiff,      )
                                    )    No.  CV-04-925-HU
13       v.                         )
                                    )
14  JOANNE B. BARNHART,             )
    Commissioner of Social         )    FINDINGS & RECOMMENDATION
15  Security,                       )
                                    )
16                  Defendant.      )
    _____)
17
    Alan Stuart Graf
18  Kimberly K. Tucker
    ALAN STUART GRAF, P.C.
19  1020 S.W. Taylor Street, Ste. 230
    Portland, Oregon 97205-2555
20
         Attorneys for Plaintiff
21
    Karin J. Immergut
22  UNITED STATES ATTORNEY
    Craig J. Casey
23  ASSISTANT UNITED STATES ATTORNEY
    1000 S.W. Third Avenue, Suite 600
24  Portland, Oregon 97204-2902

25  / / /

26  / / /

27  / / /

28  / / /


    1 - FINDINGS & RECOMMENDATION

Richard A. Morris
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

Attorneys for Defendant

HUBEL, Magistrate Judge:

Plaintiff Kathleen Woolsey-Crandall brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. §§ 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I recommend that the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on November 15, 2001, alleging an onset date of July 9, 2001. Tr. 51, 52, 323. Her application was denied initially and on reconsideration. Tr. 26, 37, 327, 333.

On January 27, 2004, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 350-73. On March 10, 2004, the ALJ found plaintiff not disabled. Tr. 13-23. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 6-8.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on joint pain, degenerative osteoarthritis, osteoporosis, vertigo, asthma, hyperthyroidism, and depression. Tr. 94. At the time of the January 27, 2004 hearing, plaintiff was fifty-one years old. Tr. 353. She is a high school graduate and has four years of college, although she does not have

2 - FINDINGS & RECOMMENDATION

a degree.  Tr. 100, 242.  Her past relevant work is as a daycare worker, teacher's aide, and in-home caregiver.  Tr. 95, 368.

I.  Medical Evidence

Plaintiff's medical records begin in February 1995 with a February 2, 1995 visit to a gynecology practice in Pendleton.  Tr. 138.  The chart note from Dr. Stephen E. Lamb, M.D., indicates that she was new to that geographic area.  Id.  At the time, plaintiff was taking estrogen and thyroid.  Id.  Dr. Lamb continued her on these medications.  Id.  Plaintiff continued to see Dr. Lamb for routine gynecological care, including annual mammograms and pap smears, until May 1998.  Tr. 133-51.

Dr. T.D. Flaiz, M.D., appears to have been plaintiff's primary care provider from May 1995 to January 2002.  Tr. 197-229, 290-302.  The chart notes from May and June 1995 indicate complaints of a somewhat chronic cough which responded well to prednisone.  Tr. 205-06.  Dr. Flaiz noted plaintiff's strong family history of asthma and allergies.  Id.

In February 1997, plaintiff reported a ringing in her ear and an episode of vertigo.  Tr. 204.  Dr. Flaiz suspected she had labyrinthitis.  Id.  He prescribed a course of Meclizine, a medication used to treat dizziness.  Id.

In July 1997, plaintiff complained of her right knee popping out of place.  Id.  In August 1997, Dr. Flaiz opined that plaintiff might have patellar subluxation.  Id.  He ordered x-rays and referred her to Dr. Richard Carpenter, M.D., an orthopedic specialist.  Id., Tr. 180.  Although Dr. Flaiz's chart notes indicate that he planned to make the referral to Dr. Carpenter in August 1997, and it appears from Dr. Flaiz's notes that plaintiff

3 - FINDINGS & RECOMMENDATION

had an appointment with Dr. Carpenter that month, see Tr. 204 (referring to "Dr. R. Carpenter 8-20-97 1:30"), Dr. Carpenter's chart notes only go back to February 1998. Tr. 180-91. There is also no evidence in the Administrative Record of the results of the patella x-rays Dr. Flaiz ordered in August 1997.

In October 1997, Dr. Flaiz noted that Dr. Carpenter placed plaintiff in a knee brace, but that she reported that she continued to have pain. Tr. 202. A February 5, 1998 history and physical, in checklist form, by Dr. Carpenter indicates that surgery was warranted for plaintiff because of evidence of locking, recurrent catching, chronic pain unresponsive to anti-inflammatory agents, internal derangement, and suspicion of torn cartilage. Tr. 188. Dr. Carpenter performed arthroscopic surgery on plaintiff's right knee on February 5, 1998. Tr. 183-85. The Administrative Record lacks any chart notes detailing what Dr. Carpenter found or actually did in the surgery.

On March 13, 1998, Dr. Flaiz reported that plaintiff had arthroscopy on her knee and that it seemed to be improving. Tr. 202. On March 16, 1998, Dr. Carpenter stated that plaintiff was pleased with the surgery and reported that she could now bend her knee without pain. Tr. 182.

In June 1998, Dr. Flaiz's chart notes indicate that plaintiff reported lower extremity pain which "sound[ed] very much like osteoarthritis." Tr. 201. He noted that x-rays of her knees suggested degenerative disease. Id. He noted that the Motrin she had been taking bothered her stomach. Id. He prescribed Arthrotec instead. Id.

In July 1998, plaintiff reported to Dr. Flaiz that she

4 - FINDINGS & RECOMMENDATION

continued to have pain in her right knee, particularly in the inferior patellar tendon. Id. Dr. Flaiz noted that x-rays showed no acute problem. Id. He referred her to rheumatologist Dr. Don E. Ballmann, M.D. Id.

Although I find no reference to it in Dr. Flaiz's chart notes, he apparently referred plaintiff to physical therapy. Tr. 153-79. The physical therapy chart notes indicate that plaintiff started physical therapy on July 1, 1998, and continued through August 31, 1998. Id. It appears that she had appointments two or three times per week. Id. At first, plaintiff complained of bilateral knee pain. Tr. 166. By the time her sessions were complete, she reported that she felt much improved and was very pleased with the results of her rehabilitation. Tr. 167. The physical therapist noted in closing that plaintiff had been highly motivated during treatment and showed increased stamina and strength in her knees with increased range of motion and decreased inflammation. Id. He recommended that she continue with her home exercise program. Id.

Plaintiff saw Dr. Ballmann on July 22, 1998. Tr. 231-32, 233. Plaintiff reported to Dr. Ballmann that she had a long history of back stiffness, but not a great deal of pain, and "has no problems other than that." Tr. 233. Dr. Ballmann noted that Dr. Flaiz referred her because of musculoskeletal problems involving primarily her lower extremities. Id.

Plaintiff told Dr. Ballmann that despite the arthroscopic surgery, her knee was not getting better and she did not like the medication she had to use. Id. On physical examination, Dr. Ballmann noted that plaintiff was in no acute distress. Id. Her back mobility was not particularly impaired, but she was somewhat

5 - FINDINGS & RECOMMENDATION

sensitive to palpation over the lower lumbar spine and she lost her lordotic curve with forward bending.  <u>Id.</u>  Her wrists, elbows, shoulders, hips, ankles, and feet all moved well.  <u>Id.</u>  Her right knee had a slight restriction of motion at about 110 degrees and the left knee moved "a little bit better than that."  <u>Id.</u>  There was no effusion on either side.  <u>Id.</u>

Dr. Ballmann remarked that plaintiff had a strong family history of degenerative arthritis.  Tr. 232.  He thought that plaintiff's muscles were quite weak.  <u>Id.</u>

In a July 22, 1998 letter to Dr. Flaiz summarizing his examination, Dr. Ballmann noted that plaintiff had quite a bit of discomfort in her right knee and that it was not responding as well as she would like following the surgery.  <u>Id.</u>  He noted that a prior MRI suggested only mild changes in her cartilage.  <u>Id.</u>  He reported that on examination, she had considerable weakness in her proximal muscles, raising a concern of polymyositis.  <u>Id.</u>  He ordered certain muscle enzyme tests and a sed rate, as well as a repeat blood count.  <u>Id.</u>  He stated that if those tests were normal, he was unsure what else he could offer her.  <u>Id.</u>  He suggested she might benefit from a particular type of new injection to the knee with material that aids in cartilage growth.  <u>Id.</u>

On July 29, 1998, plaintiff had x-rays taken of her lumbar spine and sacroiliac joint to rule out ankylosing spondylitis.  Tr. 212.  The x-rays were normal except for a slight demineralization of the lumbar spine.  <u>Id.</u>  An August 7, 1998 bone density test showed borderline osteoporosis of the lumbar spine and left hip. Tr. 213-14.

In September 1998, Dr. Flaiz noted that Dr. Ballmann's

6 - FINDINGS & RECOMMENDATION

rheumatology workup did not show any definitive diagnosis. Tr. 200. She was "doing pretty well" at that time in terms of joint pain. Id. She was taking Relafen, an anti-inflammatory, and Fosamax, for osteoporosis, and was in a knee brace. Id. Plaintiff had another bone density test done in January 1999 which showed osteopenia of the lumber spine and left hip, but also showed a mild increase of bone density as compared with the previous study performed six months before. Tr. 207. The increase "show[ed] a good response to Fosamax therapy." Id.

In February 1999, Dr. Flaiz noted that plaintiff complained of stomach burning which he attributed to the Relafen. Tr. 301. He gave her samples of Celebrex to try instead. Id. He noted the almost two-percent increase in bone density since starting Fosamax. Id. In March 1999, Dr. Flaiz noted that plaintiff's laboratory work was unremarkable and that she was doing well on Celebrex. Tr. 300. She was having no stomach difficulties and her joints were doing well. Id.

In September 1999, Dr. Flaiz noted that plaintiff's husband had filed for divorce and that she was weepy and withdrawn. Id. He started her on Celexa. Id. He also restarted her on Synthroid for her thyroid condition. Id. Later that month, he noted that she seemed to be doing a "great deal better" on the Celexa. Tr. 302. In early January 2000, Dr. Flaiz prescribed Doxepin for plaintiff's complaints of insomnia and indicated she would continue on Celexa. Id. On January 11, 2000, plaintiff reported that her insomnia was better with the Doxepin. Tr. 295. At that time, Dr. Flaiz also noted that plaintiff had an ongoing problem with right knee pain although he noted that "just symptomatic treatment is

7 - FINDINGS & RECOMMENDATION

indicated." Tr. 295.

In June 2000, plaintiff's medications included Aerobid, Albuterol, Fosamax, Levoxyl, Doxepin, Celexa, and Celebrex. Tr. 294. Her lab work was unremarkable. Id. Dr. Flaiz noted her weight gain and indicated that her activity had likely decreased as a result of her orthopedic problems. Id. He advised a decrease in calories. Id.

In September and October 2000, plaintiff complained of low back and right hip pain. Id. Dr. Flaiz found that she had fairly good range of motion, but had pain with movement and a lot of stiffness. Id. He gave her a "burst of prednisone." Id. In a follow-up visit on October 11, 2000, Dr. Flaiz noted that "[n]o acute joint findings" were present. Id.

In February 2001, plaintiff complained that Celebrex was not helping. Tr. 296. At that time, her medications were Levoxyl, Fosomax, Prempro, Meclizine, Celexa, Doxepin, Aerobid, Alupent, Celebrex, and Tylenol as needed. Tr. 293. Dr. Flaiz noted plaintiff's problem with joint pain and an ostepenia. Tr. 293. He stated that she does not tolerate any vigorous physical activity because of swelling and discomfort in her joints. Id. He noted an example of her getting stiff and sore when she helps scrub a client's floor. Id. He indicated that she may need to look for sedentary work. Id. He also noted that she probably needed to take Celexa on a "somewhat more regular basis." Id. Her asthma was stable on inhalers. Id.

In September 2001, there is an indication that plaintiff received more prednisone because of a "flare up" with her back and hip. Tr. 297. No other treatment appears to have been received

8 - FINDINGS & RECOMMENDATION

from Dr. Flaiz for her back or hip for the rest of that year. In January 2002, the last chart entry by Dr. Flaiz, there is a note stating "talk arthritis pain" but no other indication of specific complaints or treatment at that time. Tr. 292.

Dr. Joseph H. Diehl, M.D., examined plaintiff on July 2, 2001, at the request of Disability Determination Services (DDS). Tr. 237-40. Specifically, he was asked to evaluate osteoarthritis, and joint swelling and pain. Tr. 237. After reviewing her history, he noted that she complained of frequent episodes of low back, hip, and knee pain, and occasional episodes of pain and stiffness in her left shoulder. Id.

Plaintiff reported to Dr. Diehl that she could stand for no longer than ten minutes and walk no more than one block without having back and knee pain. Id. Bending, stooping, squatting, or lifting and carrying more than twenty-five pounds all were reported as aggravating her back and knee pain. Id. She also complained of knee pain with climbing stairs. Id. She drove, but used a back brace and a cane at most times for ambulation. Id.

At the time she saw Dr. Diehl, plaintiff was working as a caregiver for an elderly person, fifteen to twenty hours per week. Tr. 238. On physical examination, Dr. Diehl noted that plaintiff was slow to go from sitting to standing and in getting on and off the examination table. Id. She was also slow going from a sitting to a reclining position and back. Id. She wore a back brace and a brace on her right knee which she removed for Dr. Diehl's examination. Id. Her gait was abnormal with a limp favoring the right leg and complaints of right knee pain with walking. Id. She was unable to attempt heel walking because of right knee pain. Id.

9 - FINDINGS & RECOMMENDATION

She was able to squat one third of the way down and recover without assistance, but complained of marked low back and right knee pain upon doing so. Id.

She had near full range of motion at the lumbar spine. Id. There was moderate generalized tenderness over the entire lumbar areas but no muscle spasm was noted. Id. The straight leg test was positive for hip and low back pain at twenty degrees on the right and was positive for low back pain at thirty degrees on the left. Id. She had full range of motion of all joints in the upper extremities. Id.

There was moderate tenderness over the lateral aspect of the right hip and no tenderness over the left hip. Tr. 239. Range of motion was limited at the right hip with forward flexion possible to sixty degrees, internal rotation possible to twenty degrees, and external rotation possible to thirty degrees. Id. Abduction was possible to twenty degrees and adduction was possible to ten degrees. Id. There was full range of motion at the left hip and no tenderness noted there. Id.

There was moderate generalized tenderness about the entire right knee area. Id. Range of motion at the right knee was slightly limited. Id. Plaintiff was able to extend the knee fully, but flex it only to ninety degrees. Id. Slight generalized crepitus was noted about the entire right knee area. There was no tenderness in the left knee and no crepitus, effusion, or instability. Id. There was full range of motion of the left knee. Id. Neurologic examination of the lower extremities was within normal limits. Id.

Dr. Diehl reviewed several of plaintiff's medical records,

10 - FINDINGS & RECOMMENDATION

including her August 1998 bone density test, July 1998 lumbar spine x-ray, progress notes from Dr. Flaiz in 2000 and 2001 noting treatment for multiple joint complaints and depression, and an October 1998 laboratory test showing a significantly elevated sedimentation rate.  Id.

Dr. Diehl concluded that plaintiff had degenerative joint disease involving the lumbar spine, both knees, and both ankles. Tr. 240.  He opined that she would have difficulty with most vigorous and active types of work activity and those that would require standing and walking for more than fifteen to thirty minutes at a time and for more than four to five hours out of an eight-hour day.  Id.  He stated that she would have difficulty with work activities that require walking on uneven ground or climbing ladders or stairs, even infrequently.  Id.  Work activities requiring bending, stooping, squatting, or lifting and carrying more than twenty-five pounds would be difficult, even on an infrequent basis.  Id.  Dr. Diehl noted that his limitations were based on plaintiff's subjective complaints of pain and the objective findings determined during his physical examination.  Id.

Also in July 2001, plaintiff was evaluated by DDS psychologist David R. Starr, Ph.D.  Tr. 241-44.  In describing her daily activities to Dr. Starr, plaintiff reported that until two days before her July 18, 2001 examination with him, she had been a senior citizen caregiver.  Tr. 243.  She noted that presently, she volunteered at Agape House, worked on quilts, and visited friends. Id.  She did her own grocery shopping and described herself as cooking from scratch.  Id.  She drove a car.  Id.  She spent her evenings learning to knit.  Id.  She watched television, worked on

11 - FINDINGS & RECOMMENDATION

her computer, and wrote letters.  Id.

On mental status examination, Dr. Starr noted that plaintiff's mood was dysphoric[1], but her affect was variable and appropriate to thought content.  Id.  Her general mental trend suggested discouragement.  Id.

Based on his examination, Dr. Starr diagnosed plaintiff as having an adjustment disorder with depressed mood.  Tr. 244.  He noted that she was depressed, had chronic pain, and was distressed regarding the dissolution of her marriage.  Id. He opined that her depression by her description and appearance is related to stress associated with her family problems.  Id.  He also noted that her difficulties were complicated by problems with chronic pain.  Id. He stated that she could pay attention and follow directions and could think abstractly as well as make good common sense decisions. Id.  Her current Global Assessment of Functioning (GAF) score was 60 with the highest in the past year a 65.  Id.

In May 2002, DDS reviewing psychologist Robert Henry, Ph.D., assessed plaintiff as having an adjustment disorder with depressed mood, but indicated that it was situational.  Tr. 246, 249.  The only limitation he found was a mild limitation in activities of daily living.  Tr. 256.

In June 2002, DDS reviewing physician Mary Ann Westfall, M.D., found that plaintiff could occasionally lift up to twenty pounds and frequently lift up to ten pounds.  Tr. 261.  She found she

---

[1]  Dysphoria is a mood of general dissatisfaction, restlessness, anxiety, discomfort, and unhappiness.  Taber's Cyclopedic Medical Dictionary 626 (Daniel Venes & Clayton L. Thomas, eds., 19th ed. 2001).

12 - FINDINGS & RECOMMENDATION

could stand or walk for a total of at least two hours in an eight-hour day and could sit for a total of about six hours in an eight-hour day.  Id.  Her ability to push or pull was unlimited.  Id.  She could frequently climb, but occasionally balance, stoop, kneel, crouch, and crawl.  Tr. 262.  She should avoid concentrated exposure to vibration and "hazards," and should avoid even moderate exposure to fumes, odors, dusts, and gases.  Id.

On July 24, 2002, plaintiff visited an urgent care clinic for a cough and refill of her medications.  Tr. 270.  The chart note indicates that she recently got on the Oregon Health Plan and could not find a physician.  Id.  The diagnosis was for reactive airway disease.  Id.  She received prescriptions for prednisone and albuterol.  Id.

She returned to urgent care on July 31, 2002, for right hip pain.  Tr. 269.  The chart note indicates that she had multiple chronic complaints, including left hip pain in the last week and now right hip pain.  Id.  She was diagnosed as having chronic hip pain and told to discuss the issue with her primary care provider, whom she apparently saw for the first time on July 30, 2002, or to follow-up with an orthopedist.  Id.

On July 31, 2002, plaintiff was seen by Dr. Donald A. Peterson, M.D., for gluteal pain.  Tr. 267.  He noted that she was scheduled to see a "Dr. McCarthy" next week.  Id.  Dr. Peterson obtained pelvic and lumbar spine x-rays which showed facet joint arthrosis, but no major disk space narrowing.  Id.  X-rays of the hip showed no major narrowing and minute subchondral lucencies in the central area which might, or might not have, represented early degenerative changes.  Id.  He instructed her to follow up with Dr.

13 - FINDINGS & RECOMMENDATION

McCarthy for conservative management of her lumbar spine.  Id.

Plaintiff was seen on August 5, 2002, apparently by Dr. Joseph McCarthy, M.D.. Tr. 272.  The index to the Administrative Record indicates that this chart note is from Dr. McCarthy, but the signature is illegible and there is no other identifying information on the chart note.  Tr. 3; Id.  Although the list of medications is legible, the remaining writing is somewhat difficult to decipher.  Id.  It appears that her prescriptions were refilled, her blood pressure was taken, and the assessment included osteoarthritis (with no indication of the involved area), and hypothyroidism.  Id.; see also Tr. 281 (prescription orders dated August 5, 2002 by Dr. McCarthy).

Plaintiff next saw Dr. McCarthy on November 5, 2002.  Tr. 279.[2]  She complained of a cough.  Id.  The assessment indicates she had a cough and reactive airway disease.  Id.  Parts of the chart note are hard to read.  Id.  On November 15, 2002.  Dr. McCarthy[3] noted her reactive airway disease and renewed some of her prescriptions.  Tr. 278.  Id.

In February 2003, DDS reviewing physician Dr. Martin Kehrli, M.D., assessed plaintiff's residual functional capacity.  Tr. 284-89.  He found that she could occasionally lift and carry twenty-five to thirty pounds and frequently carry up to ten pounds.  Tr. 285.  He indicated that she could stand or walk for about six hours in an eight-hour day and could sit about six hours in an eight-hour

_____

[2] This chart note also lacks any identifying information and contains an illegible signature.  The index again identifies it as a medical record of Dr. McCarthy's.  Tr. 3.

[3] See footnote two.

14 - FINDINGS & RECOMMENDATION

day.  _Id._  She should not perform activities requiring constant or frequent pushing or pulling with her right lower extremity.  Dr. Kehrli also found that she could occasionally climb, stoop, kneel, and crawl, but could frequently balance or crouch.  Tr. 287.  He noted that she should avoid concentrated exposure to extreme cold, wetness, vibration, and hazards such as machinery and heights.  Tr. 288.

In March 2003, plaintiff reported having trouble with a cough and asthma.  Tr. 342.  Dr. McCarthy[4] noted her reactive airway disease.  _Id._  On January 12, 2004, Dr. McCarthy's office indicated that plaintiff had arthritis in her lower back.  Tr. 341.

II.  Plaintiff's Testimony

Plaintiff testified she stopped performing work as a senior citizen caregiver because she could no longer lift people out of bed because of her pain.  Tr. 356, 362.  She explained that she has pain in her back, tailbone, and right hip.  Tr. 356.  She also has pain in her right knee.  Tr. 357.  She experiences constant pain, usually at a pain level of 5-6 on a 10-point pain scale, but a couple of times per week it reaches a 10.  _Id._

At the time of the hearing, she was taking several medications, including the pain medication hydrocodone in the evening.  Tr. 359.  She explained that she takes it only in the evening because it makes her groggy.  _Id._

Plaintiff testified that she was limited to five to ten minutes of sitting and can stand for only five minutes.  _Id._  She could lift ten to fifteen pounds.  Tr. 360.  She rests during the

---

[4]  See footnote two.

15 - FINDINGS & RECOMMENDATION

day, elevating her legs and icing her knee. Id. She also uses a cane. Id.

Plaintiff testified that she lived with her husband, but that she does seventy-five to eighty percent of the housework. Tr. 361. She also gets the mail and grocery shops. Tr. 362-63. He helps with dishes sometimes and with bringing in the groceries. Tr. 361. She has trouble with washing a lot of pans. Tr. 363. Her husband also helps with vacuuming and laundry by putting some of the clothes in the washer. Id. However, on bad days, she cannot do much of anything and has problems with lifting or sitting. Tr. 361. On those days, she does no chores, but lets them wait until another day. Tr. 361-62.

Plaintiff goes to church once per month, with the actual service lasting about an hour, and she and her husband go out to dinner about once per month. Tr. 365. She drives a car. Id. In the week preceding the hearing, she and her husband went to the Oregon coast for dinner, driving there from Hillsboro and back in one day. Tr. 366. In the several months before the hearing, she and her husband had driven from Hillsboro to Richland, Washington, and drove back the next day. Id.

Plaintiff stated she could not perform even sedentary work because she cannot depend on her body working. Tr. 362. In response to a question about how her depression affects her dealing with people, plaintiff responded that she is "real sensitive," and "too sensitive, at times." Id.

III. Vocational Expert Testimony

The vocational expert (VE) testified that plaintiff's past relevant work was as an in-home caregiver, which he ranked as

16 - FINDINGS & RECOMMENDATION

medium exertion and semi-skilled, day care worker, which he ranked as light exertion and semi-skilled, teacher's aide, which he ranked as light exertion and skilled, and a volunteer program director which he ranked as sedentary and skilled. Tr. 368.

The ALJ posed the following hypothetical to the VE: forty-eight year old individual with plaintiff's past relevant work, who can occasionally lift twenty-five to thirty pounds and frequently lift ten pounds, and who can stand and walk six hours out of an eight-hour day and can sit six hours out of an eight-hour day. Tr. 368. Periodically, the individual will need to alternate sitting and standing to relieve pain or discomfort. Id. The individual cannot constantly push or pull with the right lower extremities. Tr. 368-69. Additionally, the individual can occasionally climb, kneel, stoop, and crawl. Tr. 369. And, the individual should avoid exposure to extreme colds, wetness, vibrations, and hazardous machinery and heights. Id.

Based on that hypothetical, the VE testified that such an individual could perform plaintiff's past relevant work as a day care worker and teacher's aide. Id. When the hypothetical was changed to a lifting restriction of occasionally lifting up to ten pounds, the VE testified that the individual could still perform the teacher's aide position. Id.

THE ALJ'S DECISION

The ALJ found that plaintiff had not engaged in any substantial gainful activity since her alleged onset date. Tr. 17, 22. The ALJ then found that plaintiff had severe impairments of degenerative joint disease of the right knee and lumbar spine facet joint arthrosis with secondary mood disorder. Tr. 19, 22. While

17 - FINDINGS & RECOMMENDATION

finding the impairments to be severe, he concluded they did not meet or equal any listed impairments. Id.

The ALJ then determined that plaintiff retained the residual functional capacity (RFC) to lift twenty-five to thirty pounds occasionally and ten pounds frequently. Tr. 21, 23. He found that she could stand and walk six hours out of an eight-hour day, and sit six hours out of an eight-hour day. Id. He determined that she required the option to periodically change positions between sitting and standing. Id. She could occasionally kneel, stoop, crawl, and climb, needed to avoid concentrated exposure to extreme cold, wetness, vibration, hazardous machinery, and heights, and could not no constant or frequent pushing or pulling with the right lower extremity. Id.

In reaching this RFC determination, the ALJ discounted plaintiff's subjective testimony and rejected the limits set by Dr. Diehl. The ALJ determined that plaintiff's pain and limitations testimony was not credible because of the minimal treatment she sought and because of her daily activities. Tr. 20. He noted that since her alleged July 2001 onset date, she had sought very little treatment for her pain complaints. Id. He further noted that she receives pain medication and the record revealed no evidence of side effects and no evidence that the pain medications did not control her pain symptoms. Id. He stated that plaintiff takes an anti-depressant medication, but has sought no other mental health treatment and has not reported difficulties managing her depression to any treating physician since the alleged onset date. Id.

The ALJ then noted that plaintiff's allegations that she was limited to five to ten minutes of sitting and five minutes of

18 - FINDINGS & RECOMMENDATION

standing were inconsistent with her "active lifestyle." Id. He noted that she regularly went out to dinner with her husband, that she recently rode in a car to the coast with her husband, and that a friend reported that plaintiff used an exercise bicycle, went fishing twice per week during fishing season, shopped several times per week, and visited friends several times per week. Id. The ALJ also noted that there was no evidence that plaintiff's use of a cane or lying down with her legs elevated, were medically necessary. Id.

The ALJ rejected Dr. Diehl's limitations as inconsistent with plaintiff's daily activities. Tr. 21. In addition to the activities noted in the previous paragraph, the ALJ noted that plaintiff reported that she cooks from scratch and does her own grocery shopping. Id. He also noted that at the time Dr. Diehl examined plaintiff, plaintiff was working fifteen to twenty hours per week as a caregiver for an elderly person. Id. Thus, the ALJ concluded, her activities were inconsistent with Dr. Diehl's limitations in standing and walking. Id.

Based on this RFC, the ALJ, relying on the VE's testimony, concluded that plaintiff could perform her past relevant work as a daycare worker and teacher's aide. Tr. 22, 23. He further found that even if plaintiff were capable of lifting only ten pounds, she would still be capable of returning to her past work as a teacher's aide. Tr. 22. Accordingly, the ALJ determined that plaintiff was not disabled. Tr. 22, 23.

STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical

19 - FINDINGS & RECOMMENDATION

or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure.  <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395 (9th Cir. 1991).  The claimant bears the burden of proving disability.  <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20 C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  <u>Yuckert</u>, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, he is not disabled.  If he cannot perform past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§

20 - FINDINGS & RECOMMENDATION

404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Baxter, 923 F.2d at 1394. Substantial evidence means "more than a mere scintilla" but "less than a preponderance." Id. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id.

## DISCUSSION

Plaintiff argues that the ALJ erred by rejecting the functional capacity limitations set forth by Dr. Diehl and by rejecting plaintiff's subjective pain and limitations testimony. Plaintiff also contends that the ALJ improperly ignored evidence of plaintiff's right hip impairment. As a result of these errors, plaintiff contends, the ALJ's hypotheticals to the VE were invalid, rendering that testimony without evidentiary value and the ALJ's reliance on it reversible error. I address plaintiff's arguments in turn.

## I. Rejection of Dr. Diehl's RFC

As noted above, the ALJ rejected Dr. Diehl's limitations as inconsistent with plaintiff's daily activities. Tr. 21. An ALJ may reject the uncontradicted medical opinion of an examining physician only for "clear and convincing" reasons supported by substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1996).

21 - FINDINGS & RECOMMENDATION

Plaintiff contends that the ALJ erred in finding an inconsistency between Dr. Diehl's limitations and the fact that at the time Dr. Diehl examined her, she was still working part-time as a caregiver to the elderly. Plaintiff argues that the ALJ failed to acknowledge that although plaintiff was still working on the July 2, 2001 examination date, she was in the process of phasing out her business and she ceased performing those services a couple of weeks after Dr. Diehl's examination. Tr. 243 (Dr. Starr's July 18, 2001 report indicating that plaintiff stopped working as a senior citizen caregiver two days earlier); Tr. 362 (plaintiff's testimony that she gave up being a caregiver because of pain and inability to lift clients out of bed).

Plaintiff also contends that the ALJ failed to noted that while plaintiff does housekeeping activities, she takes frequent breaks or leans on counters to get them done. Additionally, plaintiff contends that there is no evidence that she performed any of the allegedly inconsistent activities cited by the ALJ after her alleged onset date with a frequency or duration that contradicts her testimony.

I reject plaintiff's arguments. While it is true that soon after seeing Dr. Diehl, plaintiff quit her senior caregiver business because she claimed she could no longer perform its physical demands, it is also true that at the time Dr. Diehl rendered his limitations, she was performing the caregiver position and thus, it was not unreasonable for the ALJ to note the inconsistency between Dr. Diehl's limitations and the caregiving activity that plaintiff was performing at that time.

Moreover, even if the ALJ should have recognized that

22 - FINDINGS & RECOMMENDATION

plaintiff gave up the caregiver position very shortly after Dr. Diehl's examination, the inconsistency between the caregiver work activities and the limits rendered by Dr. Diehl were not the only inconsistencies relied on by the ALJ. Thus, any error by the ALJ was harmless. See Batson v. Commissioner, 359 F.3d 1190, 1197 (9th Cir. 2004) (applying harmless error standard); Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001) (not all of an ALJ's reasons for discrediting a claimant must be upheld, as long as substantial evidence supports the ALJ's credibility determination).

As the ALJ noted, plaintiff's reports of her daily activities to DDS examining psychologist Dr. Starr, just over two weeks after her examination by Dr. Diehl, and after her July 9, 2001 alleged onset date, included quilting, visiting friends, doing her own grocery shopping, cooking such things as stews, pork chops, rice, fish, and potato salad from scratch, learning to knit, working on her computer, and writing letters. Tr. 22, 243. It was not error for the ALJ to conclude that these activities were inconsistent with Dr. Diehl's limitations to fifteen to thirty minutes of standing and walking and a total of four to five hours of standing or walking in an eight-hour day.

The ALJ also relied on the "Third Party Information" questionnaire submitted by plaintiff's friend about two months before her examination with Dr. Diehl, to conclude that plaintiff's daily activities were inconsistent with Dr. Diehl's limitations. Tr. 21. The friend reported that plaintiff left home every day to

23 - FINDINGS & RECOMMENDATION

shop, go to church, see a movie, or take a ride.   Tr. 82.[5]
Although the friend indicated that plaintiff could no longer dance,
camp, hike, or go for long walks, she also indicated that plaintiff
was capable of daily driving, climbing some stairs to get to her
apartment, riding an exercise bicycle, and fishing two or more
times a week during fishing season.  Tr. 83-86.  She also vacuumed,
dusted, and emptied the trash without help.  Tr. 88.

While plaintiff was reported to be engaged in these activities
approximately two months before her examination with Dr. Diehl and
her alleged onset date, no medical records suggest any basis for a
significant worsening of her condition during the intervening
period.  Thus, it was not unreasonable for the ALJ to conclude that
at the time Dr. Diehl examined her, she was engaging in a wide
variety of activities as noted by her friend that were inconsistent
with Dr. Diehl's limitations.

The ALJ's reliance on the activity information plaintiff
provided to Dr. Starr and the activity information from the third
party, constitutes reliance on substantial evidence in the record
and provided the basis for the ALJ's clear and convincing reasons
to find Dr. Diehl's functional assessment inconsistent with the
activities plaintiff was engaging in at the time.

_____

[5] Although the ALJ did not cite to each individual activity
reported by the friend on the "Third Party Information"
questionnaire, the ALJ did rely on the information in the
questionnaire as a basis to reject Dr. Diehl's limitations. Tr.
22.  Accordingly, my reference to some of the other activities
reported in the questionnaire is not a citation to evidence
beyond that discussed by the ALJ.  Connett v. Barnhart, 340 F.3d
871, 875 (9th Cir. 2003) (error for district court to affirm
ALJ's credibility decision based on evidence not discussed by the
ALJ).

24 - FINDINGS & RECOMMENDATION

II.  Rejection of Plaintiff's Subjective Testimony

The ALJ rejected plaintiff's pain and limitations testimony as not credible because of her minimal treatment and her daily activities.  Tr. 20.  The ALJ also noted that plaintiff receives pain medications, but there was no evidence of side effects or that the medications do not control the pain.  The ALJ further noted that plaintiff was prescribed an anti-depressant, but sought no other mental health treatment and had not reported difficulties managing her depression to any treating physician since her alleged onset date.  Id.

Plaintiff contends the ALJ erred because a reasonable interpretation of the record is that during the period at issue, she was without health insurance, that she has not engaged in a level of activity since her onset date that is inconsistent with her testimony, that the record shows she has complained of pain even when on medication, and that she has reported depressive symptoms since her onset date.

The ALJ is responsible for determining credibility.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering.  Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  When determining the credibility of a plaintiff's complaints of pain, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  Orteza v. Shalala, 50

25 - FINDINGS & RECOMMENDATION

F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the
ability to perform household chores, the lack of any side effects
from prescribed medications, and the unexplained absence of
treatment for excessive pain when determining whether a claimant's
complaints of pain are exaggerated.  Id.

The record regarding plaintiff's health insurance status is
unclear.  The ALJ stated that since the date plaintiff alleges she
became disabled in July 2001, she sought very little treatment for
her pain complaints.  Plaintiff notes, however, that an urgent care
medical record dated July 24, 2002, indicates that she just got on
the Oregon Health Plan and was having trouble locating a physician.
Tr. 270.

In another record, however, which is undated, but would have
been completed at the time plaintiff was requesting a hearing
before an ALJ in March 2003, plaintiff wrote that she lost her
Oregon Health Plan for a little while and just got it back.  Tr.
127.  The actual time without insurance was not specified.

Plaintiff correctly notes that it is improper to draw a
negative inference regarding a claimant's credibility when the
record shows that the claimant is unable to afford prescribed
treatment.  Soc. Sec. Ruling (SSR) 82-59 (1982 WL 31384, at *4).
The record is unclear as to when plaintiff was without health
insurance.  Additionally, there is discussion as to whether during
whatever time she was without health insurance, she was unable to
afford treatment or was unable to locate free community care
resources.  Id. (noting that justifiable cause for failure to
follow prescribed treatment exists when the individual is unable to
afford prescribed treatment which he or she is willing to accept,

26 - FINDINGS & RECOMMENDATION

but for which free local community resources are unavailable). While remand to the ALJ for further development of the record on this issue would ordinarily be appropriate, the ALJ's error in this regard is harmless given the other bases articulated by the ALJ in support of his rejection of plaintiff's testimony.

Next, plaintiff contends that the ALJ's finding that her level of activity was inconsistent with her subjective testimony, is not supported by the record. The ALJ noted, however, that at the time of the hearing, plaintiff testified that she went out to dinner monthly with her husband and that just the week before the hearing, she and her husband had driven to the Oregon coast and back in one evening for dinner. The ALJ's conclusion that these activities were inconsistent with plaintiff's testimony that she could sit for only five to ten minutes was a clear and convincing reason supported by the record.

Next, the ALJ noted that there was no evidence that plaintiff suffered side effects from her pain medication and there was no evidence that the medication did not control her pain symptoms. Plaintiff does not challenge the ALJ's conclusion regarding the lack of side effects. She argues, however, that there is evidence that she has complained of pain even while taking pain medication.

The records to which plaintiff cites show that twice during a time when she was apparently taking over the counter analgesics or Tylenol, she complained of pain. Tr. 237 (Dr. Diehl noting plaintiff's complaint of low back, hip, and knee pain and further noting that her medications included "a variety of over the counter analgesic[s]"); 242 (Dr. Starr noting that plaintiff reported being in "constant pain" and further noting that her medications included

Tylenol).[6]

However, other records from a time period closer to the hearing when she gave the testimony the ALJ rejected, indicate that when plaintiff was taking Vicodin or arthritis-specific Tylenol, she did not make complaints about pain to her treating physician Dr. McCarthy. Tr. 272, 281, 278, 341, 342, 336-45. Thus, the ALJ's finding, which accounted for the more relevant evidence because it pertained to the approximate seventeen-month period prior to the hearing, was not erroneous. The ALJ's reason was clear and convincing and supported by substantial evidence in the record.

Finally, as to her depressive symptoms, plaintiff cites to one instance in the record where, after her alleged onset date, she apparently reported depressive symptoms despite taking an anti-depressant medication. The record is the July 18, 2001 evaluation by Dr. Starr, which took place only a few days after plaintiff's alleged onset date. Tr. 244. There, Dr. Starr noted that plaintiff's medication included the antidepressant Celexa. Tr. 242. He also concluded that she was depressed. Tr. 244.

Dr. Starr's report is of limited relevance to plaintiff's argument that the ALJ erred in rejecting plaintiff's testimony about her depression. The ALJ correctly noted that plaintiff had sought no treatment for her depression aside from medication. Moreover, because Dr. Starr was an examining psychologist,

---

[6] Plaintiff also cites to Tr. 267. While that medical record notes her complaint of gluteal pain, the medication list includes no pain medications. Tr. 267. Thus, it fails to show an example of plaintiff complaining of pain despite taking pain medication.

plaintiff's report of depression to him, very shortly after her onset date, does not contradict the ALJ's statement that she had not reported difficulties managing her depression to any treating physician since her onset date. Tr. 20. The record supports the ALJ's finding. Plaintiff has identified no specific limitations related to her depression and reported no functional limitations to her treating physicians. Even at the hearing she testified only that her depression made her "real sensitive." Tr. 362-63. The ALJ did not err in rejecting any testimony by plaintiff to the effect that her depression created functional limitations.

III.  Hip Impairment

The ALJ did not include any impairment related to plaintiff's right hip as a severe impairment. Plaintiff alleges that the Administrative Record contains objective medical evidence of a right hip impairment which causes pain and interferes with work-like activities such as walking, sitting, and concentrating. Thus, plaintiff argues, the ALJ erred in not including plaintiff's right hip impairment as a severe impairment and considering it when evaluating her RFC.

In response, defendant contends that although the ALJ did not separately address plaintiff's hip impairment, any error was harmless because the ALJ addressed all of plaintiff's symptoms and complaints in his credibility determination and accounted for all credible limitations in his RFC assessment. Although the ALJ did not accept all of plaintiff's subjective complaints, based on the complaints he accepted, he assessed plaintiff as being able to perform a limited range of light work, needing a sit/stand option, and having limitations on kneeling, stooping, crawling, and

29 - FINDINGS & RECOMMENDATION

climbing.  Defendant contends that these limitations accommodated all of the medical findings and all of plaintiff's credible complaints.

In reply, plaintiff contends that because a hip impairment logically impacts a person's ability to sit, stand, and walk, omission of the impairment from consideration is not harmless error.

I agree with defendant.  The ALJ's decision shows that he considered sitting, standing, and walking limitations which are all of the limitations that plaintiff contends stem from her hip impairment. Tr. 20-21 (rejecting plaintiff's subjective statements regarding her sitting and standing limitations; rejecting Dr. Diehl's limitations regarding her walking and other limitations); see also Tr. 21 (ALJ's RFC includes limits on ability to stand and walk and ability to periodically change between sit and stand). Thus, even if was error for the ALJ to omit a right hip impairment from his list of severe impairments, the error was harmless given that the hip impairment does not allegedly cause any symptoms or functional limitations other than those already considered by the ALJ.

                        CONCLUSION

I recommend that the ALJ's decision be affirmed.

                     SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due June 15, 2005.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due

30 - FINDINGS & RECOMMENDATION

June 29, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this __31st__ day of _May_____, 2005.


                                    _/s/ Dennis James Hubel_____
_____ Dennis James Hubel
                                    United States Magistrate Judge

31 - FINDINGS & RECOMMENDATION